(No. 21439.—
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* E. O. PALMER, Plaintiff in Error.

*Opinion filed December 23, 1932—Rehearing denied Feb. 8, 1933.*

DUNN and DEYOUNG, JJ., dissenting.

ROY D. JOHNSON, and BARKER DAVIS, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, EDWARD P. ALLEN, State's Attorney, and J. J. NEIGER, (JOHN T. INGHRAM, JR., of counsel,) for the People.

Per CURIAM: The plaintiff in error was indicted in the circuit court of Adams county for stealing a hog, alleged to be of the value of $40. Upon a trial by a jury he was found guilty, was sentenced to imprisonment in the penitentiary, and has sued out a writ of error.

Plaintiff in error contends that the verdict was contrary to the evidence and that the court erred in giving an in-

struction. In support of his contention that the verdict was contrary to the evidence it is contended that the ownership of the hog was not proved as alleged and that its value was not shown to be as much as $15.

The indictment originally contained four counts, two alleging ownership in Della Grieser and two in Nina Virginia Grieser. On the trial the State's attorney entered a *nolle prosequi* as to the counts alleging ownership in Della Grieser.

Della Grieser and the plaintiff in error owned adjoining farms on Long Island, in the Mississippi river, in Adams county. Both lived in LaGrange, Missouri. Mrs. Grieser had on her farm about forty pigs and hogs, among them a dirty-white sow heavy with pig. The sow had been brought up as a pet, and Mrs. Grieser testified that she had given it to her daughter, Nina Virginia, who was seven years old. Nina and her half-sister, Juanita McDowell, who was twelve years old, made a pet of the pig. Nina testified that it was a little pig when she first got it, and its name was Betsy and it knew her. Juanita testified about the pig's history, its disappearance, and to her afterwards seeing it on the plaintiff in error's farm in LaGrange. Mrs. Grieser missed the sow about July 19, 1931. Nine days later she, with her mother and her two daughters, saw it with a litter of six pigs in a pen in LaGrange owned by the plaintiff in error in which he was accustomed to have hogs from time to time. These and other witnesses identified the sow found in plaintiff in error's possession by two black spots about the size of a quarter in its skin behind its right ear. Plaintiff in error testified that his wife owned the sow; that it was one of a litter of a sow owned by his wife which had died and whose pigs had been brought up by hand; that the others of the litter had been sold, weighing from 145 to 150 pounds each, but this one had been retained because it was with pig, and to sell it in that condition would result in its being docked in weight; that

he had it in LaGrange and on July 14 moved it across the river to the place on the island where the pigs were littered, and that a few days later he moved her and her pigs back to LaGrange and put them in the pen where Mrs. Grieser and her mother and children saw them.

The testimony was conflicting. The testimony of the prosecution was sufficient to sustain the allegations of the indictment as to the ownership of the sow. The testimony of the defense was sufficient to sustain the defendant's claim as to ownership, and it was the province of the jury to determine the credit which should be given to the testimony of the witnesses. There is evidence sufficient to sustain the verdict, and we cannot say that there is clearly a reasonable doubt as to the guilt of the defendant.

As to the value of the property stolen, the abstract shows that W. W. McPike, a witness for plaintiff in error, testified: "Part of the time I am familiar from time to time as to the value of hogs—the market value of hogs. To my best recollection hogs in that condition, ready to farrow, would be worth probably something like six cents a pound. Yes, it is a fact, hogs in that condition sell on the market in weight. I would not say positively how much they are docked. It is 50 to 70 pounds. Ordinarily I think there is a difference to their docking. Yes, it would cut the price of a hog down considerably well on a basis of six cents a pound. On a weight of 150 pounds it would be nine dollars. Docking at 60 pounds at the same rate it would be $3.60, or somewhere between five and six dollars. I don't buy or sell hogs at all. Yes, sir, all I know about it is to haul hogs for hire. No, sir, when I was asked the price of hogs in July, 1931, I did not recall it to the dollar. No, sir, I can't recall what it was in August or September in that year. I am giving the average market cost. What the prices varied I could not tell you. I hauled a lot of them at that time. There is no quotation on a hog that is about to have pigs. I would not say that they always sold at the

price when with pig. Yes, sir, a hog is docked 50 to 70 pounds in that condition. Yes, sir, that is a general rule." An examination of the record shows that the market price and rule about which this witness testified was at the St. Louis Stock Yards and that he did not testify to any knowledge of values at Long Island or in Adams county, where the hog was stolen.

Roy Wagner, a truck driver for McPike, testified that during the month of July he hauled ten hogs to St. Louis that belonged to plaintiff in error. "I think the weight of those ten hogs I hauled there for Mr. Palmer weighed approximately around 145 or 150 pounds—something like that—apiece." He was asked the question, "Do you know the market price of the hogs at that time?" to which he answered, "Not particularly; somewhere around $7.50 or $7.55." The record shows that the market price with reference to which this witness was testifying was at the St. Louis Stock Yards.

Plaintiff in error on the subject of value testified as follows: "Yes, sir, I am familiar with the fair cash market value of that kind of hog at that time. It is always customary and usual to dock them when a sow that is called a piggy sow is offered for sale on the market. I always thought it was from 40 to 60 pounds for stock. Yes, sir, I remember about what the market value of hogs was at that time. It was $7.75 at St. Louis for the top. No, sir, she was not a hog that would have sold at the top price." The evidence does not show that plaintiff in error ever bought or sold any hogs in Adams county or that he was familiar with the price of hogs at any other place than the St. Louis Stock Yards.

While it was competent for the purpose of showing the value of the property stolen to show its market price at the place where it was stolen, if the property had a market price there, the evidence of the three witnesses just mentioned as to value was none of it competent and could not

be considered in this case. Evidence as to market value at the St. Louis Stock Yards, over 175 miles distant from the place where the sow was stolen, could shed no light upon its value for farrowing purposes on the farm where it was stolen. (*Newlan* v. *Dunham,* 60 Ill. 233.) In *McKee* v. *Trisler,* 311 Ill. 536, this court said: "In such a matter as the valuation of a domestic animal like the mule, anyone who has some knowledge of values may give his opinion, but evidence of market quotations or opinions as to the value of mules in distant cities was not competent."

On the subject of the value of the property stolen Mrs. Grieser testified as follows: "Yes, I have bought and sold hogs considerably. I am pretty well acquainted with the fair cash market value of sows and hogs. I have lived on the farm ten years. I have had hogs on the farm all the time. I bought and sold hogs three or four times a year, I suppose. I have had charge of the running of the farm and the selling and buying of the stock since my husband died. I have made deals by myself. I consider that I am qualified to state the fair cash market value of the hogs as of July 19, 1931. Well, I cannot state as to the fair cash market value of this sow when it disappeared on that date. The sow was about to litter. I couldn't just say as to the market price. I would not take less than $25 for her. If the hog was put up for sale in the open market, where everyone had a chance to bid, she would have brought $25 at that time, I believe. Yes, sir, on the 19th day of July, 1931, the day she disappeared. I bought and sold hogs over there during the year 1931. I bought one male hog. I bought brood sows not to be fed. I bought and sold a lot of hogs in February, 1931. Yes, sir, in 1931 I bought some hogs about the size described here."

Mrs. Grieser's statement that she "would not take less than $25 for her" was not competent evidence although there was no objection made to it. Her evidence that "if the hog was put up for sale in the open market, where everyone

had a chance to bid, she would have brought $25 at that time, I believe," was competent notwithstanding the fact that she used the words "I believe." (*Abbott* v. *Church,* 288 Ill. 91; *G. H. & S. A. Ry. Co.* v. *Parish,* 43 S. W. 536; *Harris* v. *Nations,* 79 Texas, 409; see, also, definition of the word "believe," in Webster's New International Dictionary.) She was a witness who had gained by practical experience special knowledge of the property so that she could testify to facts known to her from experience. The value of the property was a fact to be proved, and anyone having knowledge of the fact was competent to testify to it. (*City of Chicago* v. *Lehmann,* 262 Ill. 468.) In *Lycoming Ins. Co.* v. *Jackson,* 83 Ill. 302, it is said: "Our reports are full of cases which hold that any person acquainted with property and its value, or the value of like property, is a competent witness to prove its worth, and if competent, and he testifies, it is for the jury to estimate the value of his testimony as they do that of other witnesses. It is not our province to say that one witness is more worthy of belief than another, when they both seem to testify with equal fairness. That belongs to, and it is the duty of, the jury trying the cause, who see the manner of the witnesses on the stand."

The jury saw and heard the witnesses and were authorized to test the truth and weight of the evidence by their own knowledge and judgment, derived from experience, observation and reflection. (*Springfield Railway Co.* v. *Hoeffner,* 175 Ill. 634; *City of Chicago* v. *Major,* 18 id. 349.) It was a matter peculiarly within the province of the jury to find and determine the value of the property stolen from the evidence in the case, and we cannot say that they were not fully justified in finding the value which they did.

The only other error argued is the giving of the first instruction at the request of the People, as follows:

"The court instructs the jury that the indictment in this case consists of four counts and that the second and fourth

counts of the indictment have been dismissed by the State and they are now out of the case; that the first and third counts of the indictment charge the defendant, Palmer, with the crime of grand larceny, the larceny consisting of the stealing of a hog the property of Nina Virginia Grieser of the value of $40. You are further instructed in the language of the statute that, 'larceny is the felonious stealing, taking, carrying and driving away the personal goods of another. Larceny shall embrace every theft which deprives another of his money or of personal property.' "

The objection to the instruction is that it omitted from the definition of larceny, which it purported to give in the language of the statute, the words "leading and riding," which appeared in the statute but not in the instruction, and that it informed the jury that the value of the property stolen was $40. There was no evidence that the hog stolen was led or ridden away, and it was unnecessary, in defining the crime, to include in the definition language having no connection with the evidence in the case. As to the value of the property, the instruction merely purports to state what the indictment charges. That the jury were not misled by the statement in the instruction in regard to the value alleged in the indictment appears from the fact that they found the value to be $20 and not $40.

Finding no reversible error, the judgment of the Adams county circuit court is affirmed. *Judgment affirmed.*

Mr. JUSTICE DUNN, dissenting:

There is evidence of the ownership of the hog as alleged in the indictment sufficient to sustain the verdict in this case, so that it cannot be said that there is clearly a reasonable doubt on this question as to the guilt of the defendant. The value of the hog, however, is a material allegation, and the proof of it must be, beyond a reasonable doubt, as clear as the proof of any other allegation of the indictment. Every person convicted of larceny, if the prop-

erty stolen exceeds the value of $15, is subject to imprisonment in the penitentiary not less than one nor more than ten years. If the property stolen is of the value of $15 or less, the person convicted is subject to be imprisoned in the county jail, or to labor in some place and under the terms mentioned in the statute, not exceeding one year and fined not exceeding $100. Proof of the value of the property beyond a reasonable doubt is required to ascertain the degree of the crime and the character and extent of the punishment.

Mrs. Grieser testified: "I have bought and sold hogs considerably. I am pretty well acquainted with the fair cash market value of sows and hogs. I have lived there on the farm ten years. I have had hogs on the farm all the time. * * * I bought and sold hogs three or four times a year, I suppose. I have had charge of the running of the farm and the selling and buying of the stock since my husband died. * * * I have made deals by myself. I consider that I am qualified to state the fair cash market value of the hogs as of July 19, 1931. Well, I cannot state as to the fair cash market value of this sow when it disappeared on that date. The sow was about to litter. I could not just say as to the market price. I would not take less than $25 for her. If the hog was put up for sale in the open market, where everyone had a chance to bid, she would have brought $25 at that time, I believe. I bought and sold hogs over there. During the year 1931 I bought one male hog. I bought brood sows, not to be fed. I bought and sold a lot of hogs in February, 1931." This was the only evidence for the People in regard to value.

Mrs. Grieser was competent to testify as to the value of the hog. Her testimony in chief was that she had bought and sold hogs for a number of years, but she did not claim to be informed in regard to market value. In fact, she testified that she could not state as to the market value of the sow when it disappeared but that she would not take less than $25 for her. This statement, of course, was incom-

petent. Her statement, "if the hog was put up for sale in the open market, where everyone had a chance to bid, she would have brought $25 at that time, I believe," was of little value as evidence. Nowhere did she testify to the market value of hogs, and her testimony was that she was not familiar with the market price. On the other hand, the defendant and two of his witnesses testified to the market price of hogs at the time, that they were acquainted with it, and that the market price was from six cents a pound to seven seventy-five at the top, and testimony was given tending to show that the weight of the sow was from 145 to 150 pounds, instead of about 200 pounds, as testified to by Mrs. Grieser. Testimony also showed that it was the custom to dock a sow that was with pig, when offered for sale on the market, from 40 to 60 or 70 pounds.

The defendant was a farmer, who raised and sold hogs. He lived in LaGrange, Missouri, where he owned his residence and a four-acre tract of land about four blocks from his home. He had a farm of nearly three hundred acres across the Mississippi river, on Long Island, in Adams county, Illinois. The two witnesses McPike and Wagner, mentioned in the opinion of the court, were truck drivers who hauled hogs for him to the St. Louis market and had done so early in August, soon after the events which are the subject of the present prosecution. Their testimony is not contradicted, their credibility is not impeached, and there is no evidence that they have any interest in the case which ought to affect the weight of their testimony. Their testimony corroborates the defendant's, and their interest in the result of the case cannot well be greater than Mrs. Grieser's. The testimony of these three witnesses was uncontradicted, except as it was inconsistent with Mrs. Grieser's opinion. The opinion of the court criticises the testimony of these witnesses because it relates to the market price at St. Louis, 175 miles distant from the place where the hog was stolen, and could shed no light on its value for farrowing purposes

on the farm from where it was stolen. It is so well known that we may take judicial notice of the fact, that the price of hogs throughout the territory tributary to any of the great markets like St. Louis and Chicago is based on the price in those markets and that the market price of hogs within 175 or 200 miles of those markets is lower than the price in those markets. Market value is the value which fixes the line between grand and petit larceny—between the felony and the misdemeanor—and the statement applies to Mrs. Grieser's testimony that when a witness offered to testify upon the question of market values says that he can not state what the market values were, he disqualifies himself from testifying. (2 McNeill's Illinois Evidence, 1671, sec. 12.) The opinion also suggests a distinction between market value and value for farrowing purposes on a farm. Since market value usually furnishes the measure of damages in civil cases as well as the measure of criminal liability in criminal cases it is the value which must be proved. It may be justly claimed that the standard is the value for the highest use for which the article in question is adapted. The proof in this case is in regard to the value in the usual market for hogs. If any other standard is to be adopted proof is required to show it. It is shown that the condition of a piggy sow reduces its value in the market. There is no evidence that it makes her more valuable elsewhere. There is no evidence in regard to the kind, quality or breeding of this sow. She was, so far as the evidence shows, just an ordinary piggy sow, and we cannot take judicial notice that her condition added to her value. That is a question of fact requiring evidence to show it. The legislature has fixed the limit between the less and the greater offense at $15, and the courts and juries should observe it. At the top price of seven seventy-five, the value of the sow at 150 pounds would be $11.62, less the deduction of 40 pounds, $3.10, which would make the value $8.52. If the weight was taken at 200 pounds, as testified to by Mrs. Grieser, the

value would be $11.36, and if there was no deduction of 40 pounds for the piggy condition of the sow, the utmost limit of the value under this evidence would be $14.76. The preponderance of the evidence is that the value of the sow was less than $15, and for this reason the judgment should be reversed.

Mr. JUSTICE DEYOUNG concurs in the foregoing dissenting opinion.